# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

David St. Ann,

          Plaintiff,

v.

Todd McLean, Dean Polita, Sam Morgan, Thomas Haynes, and Kelly Buczek,

          Defendants.

Case No. 15-11770

Judith E. Levy
United States District Judge

Mag. Judge Anthony P. Patti

_____/

# OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION TO PRECLUDE TESTIMONY OF CHRISTIN HARRIS [98]

On September 5, 2019, pursuant to the Court's order (ECF No. 97, PageID.2149–50), Defendants submitted a supplemental summary judgment brief on whether Plaintiff's intentional infliction of emotional distress claim ("IIED") should be permitted to go to trial, and whether Plaintiff's witness Christin Harris should be permitted to testify as a fact witness. (ECF No. 99.) Plaintiff responded. (ECF No. 97, PageID.2150.) The Court has carefully considered the issues and orders as follows.

    A.    **Factual Background**

Plaintiff alleges that on January 27, 2014, during his period of imprisonment in the Saginaw Correctional Facility ("SRF"), he received a misconduct ticket for disobeying a direct order to return to his cell. (ECF No. 99, PageID.2165, 2787.) On January 28, 2014, Warden Obell Winn approved Plaintiff to be placed under a "W05-Investigation," which increased Plaintiff's security level and housing unit to Level IV—a maximum security and disciplinary unit. (*Id.* at PageID.2192.) Plaintiff alleges that he did not receive notice of the nature of the W05-investigation and also alleges that the W05-investigation and security classification change were pretexts to punish Plaintiff for filing grievances against prison staff. (*Id.*)

Plaintiff argues that he was wrongfully held in Level IV for a total of eighteen months, during which time he alleges he was verbally harassed and psychologically abused by prison staff Defendants Todd McLean, Dean Potila, Samuel Morgan, and Thomas Haynes. (*Id.*) He alleges that Defendants told other inmates that Plaintiff was a "baby raper, child molester, rat, and was writing snitch-kites[1] on inmates." (*Id.*

---

[1] The Michigan Legislative Council Ombudsman's website defines a kite as "note or letter, usually one that a prisoner sends to a MDOC official." https://council.legislature.mi.gov/Ombudsman/PrisonTerminology.

2

at PageID.2177.) Plaintiff alleges that Defendants' scheme to spread these rumors to other inmates resulted in Plaintiff being "extorted, harmed, and/or even sexually assaulted by STG[2] gang members" while in Level IV. (*Id.*) He alleges that Defendants' position as prison staff gave them "the power of life and death" over Plaintiff and that their "evil motive and intent and recklessness" was to retaliate against Plaintiff for filing grievances and to intentionally inflict emotional distress. (*Id.* at 2177–2188.)

Plaintiff alleges that in June 2016, he suffered from a "panic attack, chest pains, difficulty breathing, numbness and loss of feeling on left side of his body" as a result of Defendants' harassment, other inmates' extortion, and the STG members' sexual assault. (*Id.* at PageID.2174.) Plaintiff alleges that he continues to receive counseling and psychiatric treatment for PTSD, nightmares, anxiety, and depression and has been prescribed psychotropic medication. (*Id.* at PageID.2175.) Finally, he

---

[2] MDOC policy directive 04.04.113 defines security threat group ("STG") as "a group of prisoners designated by the Director as possessing common characteristics, which distinguish themselves from other prisoners or groups of prisoners and which, as an entity, pose a threat to staff or other prisoners or to the custody, safety and security of the facility."
https://www.michigan.gov/documents/corrections/04_04_113_482417_7.pdf.

argues that if the Court were to dismiss his IIED claim, this would allow "criminal, inhumane, sadistic behavior to flourish in prisons." (*Id.* at PageID.2180.)

B.  **Legal Standard**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir. 2002)).

C.  **Applicable Law**

To prevail on a claim for intentional infliction of emotional distress under Michigan law, Plaintiff must demonstrate the following elements: "'(1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress.'" *Roberts v. Auto-Owners*

4

*Inc., Co.*, 422 Mich. 594, 602 (1985). "The outrageous conduct requirement is satisfied only by conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Liability arises, moreover, only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Andrews v. Prudential Secs., Inc.*, 160 F.3d 304, 309 (6th Cir. 1998) (internal citations and quotations omitted). Tortious, intentional, and even criminal conduct is not sufficient to meet this standard; instead, the test has been described as whether "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Roberts* 422 Mich. at 603.

### D. Analysis

#### 1. Intentional Infliction of Emotional Distress

Defendants deny that they intentionally caused Plaintiff emotional distress. (ECF No.98, PageID.2158.) In support of their position, they rely on affidavits of Defendants Buczek, Potila, Morgan, McLean, and Haynes filed in support of their original motion for summary judgment, which

sets forth that each individual "always acted in good faith without harassing Plaintiff in any way." (ECF Nos. 48-7, 48-5, 48-4, 48-3, and 48-2.) They also argue that there is no evidence that Plaintiff suffered "severe emotional distress," and that any symptoms Plaintiff suffered or suffers could be caused by being imprisoned for over a decade. (ECF No. 98, PageID.2159.)

For his part, Plaintiff appears to set forth two arguments regarding IIED. First, he argues that Defendants actions directly caused him emotional distress. Second, he argues that Defendants acted in a manner that they knew would lead other inmates to harass and injure him, which caused Plaintiff emotional distress.

With regard to the first argument—that Defendants' actions directly caused Plaintiff emotional distress through their harassment—Plaintiff argues that Defendants' outrageous conduct included the following:

> (1) Moving Plaintiff to a new cell in the middle of the night, allegedly unnecessarily, for the purpose of harassing him. Plaintiff submitted a declaration dated March 14, 2014 from another inmate, Antwan Officer, who witnessed the incident and stated he believed officers gave a false reason for moving Plaintiff. (ECF No.99, PageID.2215–17.)

6

(2) Barring Plaintiff from using the law library. As evidence of this, Plaintiff submitted two April 24, 2014 letters from inmates Antwan Officer and Donaven Hollingsworth, indicating that an unnamed officer told them he was not permitting Plaintiff to use the prison law library due to Plaintiff's "top-lock" classification. (ECF No.99, PageID.2221, 2224.)

(3) Issuing an April 2014 weapons misconduct ticket, which Plaintiff appears to argue was a false pretense to keep him in Level IV and subject to Defendants' continued harassment. In support of this, he submitted a copy of the misconduct report and an unclear photograph of the weapon he was accused of possessing, which he argues was not a weapon and was not his. (ECF No. 99, PageID.2226–2228, 2234.)

(4) Subjecting Plaintiff to more officer scrutiny than other inmates. In support of this argument, Plaintiff submitted three affidavits from inmate Roscoe Gallmore, dated July 13, 2015, May 21, 2015, and April 10, 2015, which indicate in sum that Plaintiff's cell was frequently searched, that Plaintiff was frequently taken away for strip searches of his body cavities, that on one occasion staff refused to give Plaintiff Band-Aids when he injured his finger, and that Plaintiff asked Gallmore to hold Plaintiff's legal documents because he was fearful they would "mysteriously disappear." (*Id.* at PageID.2240–41; 2243–44; and 2246–47.) Plaintiff also submitted a letter from inmate Dion Armstead dated August 7, 2015, indicating that he witnessed Officer Glynn using obscenities and other offensive language. Armstead also indicates that he witnessed Plaintiff crying with his head in his lap and considering committing suicide because he could not "handle the pressure of officers and staff retaliating against him." (*Id.* at 2249–51.)

(5) Questioning Plaintiff regarding an ombudsman inquiry. As evidence of this argument, Plaintiff submits his own August 12, 2015 declaration indicating that he was called to Defendant Haynes' office and questioned about an ombudsman investigation regarding St. Ann's Level IV

7

placement. According to this affidavit, Haynes stated, "if I get in trouble behind this shit-you think your ass is feeling the heat right now-you haven't seen anything!" (ECF No. 99-1, PageID.2263.) Plaintiff declared that this statement made him feel shocked, degraded, and afraid for his safety and life. (*Id.*)

Although these allegations are appalling, the evidence set forth above, either on its own or in combination, does not give rise to a colorable claim for IIED under Michigan law. For the reasons set forth below, Plaintiff's factual arguments do not establish the level of "extreme and outrageous" conduct that went "beyond all possible bounds of decency such that they could be regarded as atrocious, and utterly intolerable in a civilized community." *See Sperle v. Mich. Dept. of Corr.*, 297 F.3d 483, 496 (6th Cir. 2002).

As to item one above, Mr. Officer's letter—asserting that he believed staff gave a false reason for moving Plaintiff to a new cell in the middle of the night—is not enough to create a genuine issue of material fact that could rise to the level of atrocious behavior, and the ill-intent he assigns to unnamed officers is speculative. As to item two above, Mr. Officer's and Mr. Hollingsworth's letters regarding unnamed officers preventing Plaintiff's use of the law library does not rise to the level of intent required for an IIED claim, and it does not identify the actors,

8

both of which are necessary for this claim to survive. Item three does not provide evidence of ill-intent other than Plaintiff's speculative belief, nor is it linked to emotional distress. As to item four, Mr. Gallmore's affidavits are similarly unavailing, particularly because he does not name any of the officers involved, and there is no link between his belief that Plaintiff was subject to more scrutiny than others by Defendants. As to Mr. Armstead's letter regarding Officer Glynn, Glynn was terminated from the case and allegations regarding Glynn are not relevant to Plaintiff's IIED claim against the named Defendants. Item five does not rise to the level of outrageous conduct required to maintain an IIED claim against Defendants.

With regard to Plaintiff's second argument—that Defendants' actions caused other inmates to treat Plaintiff in a manner that caused him emotional distress—Plaintiff provides two arguments and evidence in support as set forth below:

> (1) Plaintiff argues that on February 15, 2015 Defendant Morgan stated in a loud voice to other officers, "Hey, look guys, there's St. Ann the baby raper!" and that Defendant Morgan also stated, "Hey, St. Ann, did you write any snitch-kites on anybody lately?" He argues that other officers and inmates who heard these remarks laughed at Plaintiff. (*Id.* at PageID.2258–60.)

9

> In support of these allegations, Plaintiff submits a February 25, 2015 affidavit from inmate Roscoe Gallmore. (*See id.*) Gallmore's affidavit states that Defendant Morgan spoke loudly and that he overheard these comments "while headed to chow hall while walking past the officer's desk." (*Id.*) He indicates that "several inmates and correctional officers were laughing at inmate St. Ann." (*Id.*)
>
> (2) Plaintiff's October 1, 2019 declaration that he was called disrespectful and harassing names by Defendant Morgan and Officer Glynn, which caused him to be shunned and a target at the prison. He alleges that "they" also began extorting money from Plaintiff's mother, though it is unclear if Plaintiff is alleging that other inmates were the extortionists or if the prison staff did so. Plaintiff describes being sexually assaulted in the Level IV shower on or around May 30, 2015, and a second assault in the shower on June 19, 2015. He states that he was afraid to report the assault while in Level IV because he was "afraid of being retaliated against" by Defendants and Officer Glynn. He states that he was ashamed, embarrassed, and humiliated, which stripped him of his dignity and manhood and has resulted in nightmares, depression, recurring thoughts, and difficulty coping. (*Id.* at PageID.2237–39.)

Although these allegations are appalling, Plaintiff's second theory of IIED liability is too attenuated under Michigan law to be submitted to a jury. In Michigan, generally a defendant cannot be liable for the acts of third parties. For example, in the case *Sperle v. Mich. Dept. of Corr.*, 297

F.3d 483 (6th Cir. 2002), Tammy Sperle, deceased, worked as a prison storekeeper and was murdered by inmate Clarence Herndon. Her estate sued MDOC and various prison staff for IIED for their failure to prevent her murder. Specifically, her estate alleged that the defendants had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge when the guards left her alone in the prison store and failed to check on her during her shift, which provided an opportunity for Herndon to enter the store and kill her. *Id*. at 487, 496. The Sixth Circuit found that MDOC staff lacked direct evidence of intent, and, while defendants "might have acted negligently," their conduct was not "extreme and outrageous." The Court also stated, "most importantly, the defendants did not murder Tammy Sperle. Instead, Herndon, acting on his own, committed the crime." *Id*. at 497. Accordingly, the plaintiff failed to establish a claim for IIED.

Similarly, in *Estate of Fahner ex rel Fahner v. Cty. of Wayne*, 797 F. Supp.2d 816 (E.D. Mich. 2011) (overturned on other grounds), prisoner John Fahner was murdered in a "savage" and "unprovoked" attack by his cell mate Sean Pollard fifteen minutes after Pollard entered the cell immediately after intake by jail staff. *Id*. at 823. Pollard had an

"extensive" history of incarceration, mental health conditions for which he was prescribed medication, and past instances of assaultive conduct toward other inmates and jail staff. *Id.* Furthermore, witnesses testified that when Pollard first arrived in the cell, "he didn't appear normal." *Id.* at 825. Fahner's estate sued the county and individual jail officers for IIED. They argued that prison staff acted in an outrageous manner when they failed to identify Pollard as a risk during intake procedures and they failed to protect the safety of Fahner when they placed Pollard in the same cell. *Id.* at 844–45. The district court rejected this claim, finding that defendants' conduct was not "beyond all bounds of possible decency, that must be regarded as atrocious," and found that, "[a]s in *Sperle*, Defendants did not kill the decedent," *id.* at 845, explaining that, "it cannot be said that any of the alleged actions *by Defendants* were calculated to cause Fahner's death or to subject him to emotional distress." *Id.* at 846 (emphasis added). Accordingly, the plaintiff's IIED claim failed.

Here, Plaintiff's allegation is that other inmates' behavior caused him emotional distress. But the Defendants themselves are not accused of committing the sexual assault or extorting Plaintiff's family for money.

Accordingly, as a matter of law, Plaintiff's second theory of IIED liability also fails.

Since Plaintiff's IIED claim cannot go forward, the Court need not address Plaintiff's additional arguments and evidence, such as medical records, in support of his claim for emotional distress damages. Accordingly, Defendants' motion for summary judgment as to Plaintiff's IIED claim is granted.

### 2. Christin Harris' Testimony

Next, the Court ordered the parties to submit briefs regarding whether Plaintiff's proposed witness, Christin Harris, should be permitted to testify as a fact witness at trial. Plaintiff states that Christin Harris worked at the Legislative Corrections Ombudsman's office and was authorized by law to investigate Plaintiff's claims of Defendants' retaliation. (ECF No. 99, PageID.2181.) He argues that Harris corresponded with MDOC staff AA Rosek for thirteen months while investigating Plaintiff's claim that he was improperly held in Level IV and he attaches emails between them. (ECF No.99-1, PageID.2308–2310.) The emails attached to Plaintiff's brief indicate that Harris inquired about Plaintiff's Level IV status in June 2014, January 2015,

and July 2015. (*Id.*) Plaintiff also claims that Harris visited Plaintiff while he was in Level IV. (ECF No. 99, PageID.2182.) He also believes that Harris is "the ultimate cause forcing the Defendants to place Plaintiff St. Ann back in his true/correct security level, level II." (*Id.*)

Defendants' argue that Harris's testimony would be impermissible hearsay. (ECF No.98, PageID.2160.) They argue that the Court has already ruled that certain letters from Harris constitute hearsay and cannot be admitted for the truth of the matter asserted. (*Id.*) However, a review of the Final Pretrial Order indicates that Defendants did not object to the admission of Harris's letters, and no such rulings have been issued as to documents related to Harris, though a letter to A'Keydra Abrams in the Ombudsman's office has been excluded as hearsay. (ECF No. 97, PageID.2134, 2141.)

Under Federal Rule of Evidence 401, Harris's testimony may be relevant based on the fact that she conducted an investigation into the reasons that Defendants maintained Plaintiff in Level IV at the time relevant to his case. While Defendants are correct that certain testimony from Harris could constitute inadmissible hearsay under Federal Rule of Evidence 802, Defendants have not demonstrated that all of her

14

testimony would be excludible on this basis, and it is conceivable that Harris could testify in a manner that does not constitute hearsay. Accordingly, Harris's testimony will be permitted only to the extent it is based on her personal knowledge, and not speculation, consistent with Federal Rule of Evidence 602.[3]

Plaintiff has requested that the Court permit him to "allow Harris to only read her portion of the emails that were sent to AA Rosek and also answer the questions posed by Plaintiff in Appendix T1." Plaintiff's request that Harris read aloud from the emails contained in his exhibit K1 to his brief is denied. (ECF No.99-1, PageID.2308–2310.) Reading the emails aloud would constitute inadmissible hearsay if the emails were offered to prove the truth of the matter asserted, as this appears to be Plaintiff's purpose in having her read them aloud. As to Plaintiff's list of questions contained in his Appendix T1 to his brief, the Court permits Plaintiff to question Harris but will not rule on the list of questions individually absent objections lodged by Defendants. If Defendants object

---

[3] Defendants' counsel has notified the Court that he inquired about Harris's availability to testify at the trial and learned that she has not worked in the Corrections Ombudsman's office in several years, currently works in New York, and that no further contact information for her is available. (ECF No. 115.)

to Plaintiff's questions at the time of trial, the Court will rule on them at that time.

In sum, Plaintiff is permitted to subpoena Christin Harris to testify as a fact witness at trial, and the Court will rule on Defendants' objections to her testimony, if any, at that time.

### E. Conclusion

Accordingly, Defendants' motion for summary judgment as to Plaintiff's intentional infliction of emotional distress claim is granted. Defendants' motion to preclude the testimony of Christin Harris is denied.

IT IS SO ORDERED.

Dated: November 8, 2019　　　s/Judith E. Levy
Ann Arbor, Michigan　　　　　JUDITH E. LEVY
　　　　　　　　　　　　　　United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 8, 2019.

　　　　　　　　　　　　　　s/William Barkholz
　　　　　　　　　　　　　　WILLIAM BARKHOLZ
　　　　　　　　　　　　　　Case Manager